May it please the court, your honors, Jason Mettinger on behalf of the United States. Your honors, the defendant in this case was a previously convicted drug dealer who also happened to have a murder conviction. And at his trial for a subsequent crack distribution, he got advice from his lawyer essentially to say don't testify. And that was enormously helpful advice. And it was helpful because it allowed him to essentially do two things. On the one hand, it kept out and kept the jury away from hearing about the murder conviction and the prior drug conviction. But at the same token, it allowed him to present the name D'Angelo and he got in everything that he wanted to get in through his fiancée. So the lawyer essentially gave what was good and helpful advice. And we respectfully submit that there was no prejudice that inured from that advice, even though that advice was based on a faulty understanding of ultimately what his appellate rights could have been under 609. So he happened upon the right course of action by accident? Well, I think so. And accident could be, surely. But I think really it was just a practical trial decision. I think if you asked 100 defense lawyers in this given situation what would you do, I think invariably they would say I'm not going to put my guy on the stand. I think it's always a good day if you're a defendant if the jury isn't hearing about your prior murder conviction. So I think it was helpful advice and I think it makes a as opposed to seeking, hitching your star to some sort of nascent appellate rights that you might have on a 609 ruling. As this court is aware, 609 is reviewed for abuse of discretion. In this record, they didn't even note an objection after the district court made the ruling that it did. So I think it might have even gotten plain error. So it would have been an enormously steep hill to climb. I think hitching your star more to presenting a real defense theory, which is the drugs aren't mine. When you get down to the real world and what was actually happening, he didn't decline to testify because of anything his lawyer said. He didn't want to go on the stand because his murder convictions and his earlier controlled substance convictions were going to be impeachment material. In the real world, when you are thinking, well, why didn't this person testify? It didn't have anything to do with his lawyer's advice. It had to do with the fact that he didn't want his murder conviction to come in. I think that's right, Your Honor. I think everybody realized that that conviction was going to come in if he testified and he looked at those options and declined to testify. And the record is clear that he was even asked on the record by the- And that speaks directly to the question of whether there was a reasonable probability that he was prejudiced by any erroneous legal advice. I agree with you, Your Honor. I think he was going to not testify regardless. You know, you could cite a litany of cases to this defendant about, you know, this ruling or that ruling, the loose case or some other case. But at the end of the day, you're right. He was not going to testify, Your Honor. What it comes down to, it seems to me in this case, is that Mr. Robinson is seeking essentially a per se rule that if there's erroneous legal advice, that you automatically presume prejudice. And the Supreme Court has really shied away from creating any kind of per se rules on this stuff. And so, but he's trying to suspend the Strickland standard and the prejudice prong of the Strickland standard and trying to create per se rules. And then pretty soon we're going to have this per se rule, this per se rule, and automatic prejudice, automatic prejudice. And I don't think that's at all the way the Supreme Court's going. And in fact, I object to it very strenuously because they say, look, we're limiting per se rules to a very, very small category of cases. You're absolutely right, Your Honor. And I think we can look even no further than Strickland itself, which says we're not going to impose upon lawyers some sort of robotic, you know, checklist that they have to go through. We're not going to do that. We're going to look at this fact-specific inquiry as it should be, as a case-by-case analysis. And I think if we're getting to per se rules, I mean, to a certain extent, this Court in Hutchins said the decision to testify or not is something we're not even going to go down that road of ineffective assistance. We're going to leave that for the tactical, strategic, in-trial decision that it is. But no, I agree with the Court that there should not be per se rules here. And I just think on the prejudice prong, it just is very, very clear there was no prejudice here. In addition on the prejudice prong here, I can understand why he wouldn't want to look at the facts because you've got an individual here pointing the offices to a stash of cocaine or wherever it was in the ceiling of the basement, which they found a substantial quantity of drugs plus a good bit of cash. And then they find another load of cash in his car. And there was drugs in his shorts in Mr. Robinson's bedroom. I mean, it's in the basement ceiling where he said, it's in the car, it's in the bedroom. I mean, that's prejudice? You put the murder convictions on top of that from impeachment? Wow. Right. In our view, it would have been lights out, essentially. But we do think there was so much evidence, Your Honor. We have four key admissions here. The first admission was the one you pointed out, Your Honor, that everything is in the basement ceiling. That's number one. Admission number two is that there was a bag of money in the car. That's admission number two. Admission number three, after he was taken back to the station, was, quote, I'm a drug dealer. That's a joint appendix, page 57. And then admission number four is, I'm a hardhead and I'm still selling drugs on York Road. That's, again, joint appendix, page 57. So combine four key admissions with all the physical evidence that you went through, Your Honor, of the drugs in the ceiling, the hot plate, the digital scale with the residue. The hot plate was in the ceiling, wasn't it? It was in the ceiling, in the basement. That's what I thought. And then upstairs were these shorts, which, again, you almost couldn't put it more perfectly in the sense that they're his shorts, they're in his bedroom, they're next to his wallet, his keys, and there is more crack and more money in the shorts. You know, we don't think if Mr. Robinson had testified that any rational jury would have come out a different way. You know, I think his best strategy at trial was, frankly, the one that he did, was to try to use the fiance to, you know, push this. Now, he testified when he was running a snowball business. What was the snowball business? So the testimony, it's at joint appendix, page 192 to 93. She did say that he owned a snowball stand called B's Snowball, and I think the idea was to prove that a snowball stand is a cash business, and therefore... Are we talking about snowballs? Are they snow cones that you... Yes, Your Honor, it's a... ...grape and different flavors on? Yes, Your Honor, that's right. In Maryland, they call them snowballs, shaved ice, things of that nature. In Virginia, I think we call them snow cones. Yep, so same idea. He must have sold an awful lot of snow cones to have that kind of money. You know, again, that was the inference we asked the jury to find, that this was drug money and not snowball money by any sense of the word. Let me ask you a question. I want to make sure my recollection is correct. Is my recollection that initially, the defense anticipated he could be, the judge would rule he could be impeached on the murder conviction, and that he had made the decision, they had made the decision he was going to testify. Am I right about that? So I think the record is a little muddled on that, Your Honor. I guess I'll say, at Joint Epidics, page 166, this is at the start of the defense case. The defense lawyer is asked, who are you going to have as witnesses? And at that point, the trial counsel said, I believe I will only have Ms. Powell. So in our view, the record shows at that point, he wasn't going to testify, that he'd essentially already made the decision that, you know, Judge Wilkinson mentioned that he wasn't going to get on the stand. Okay. Certainly later in the 2255 context, he now says, well, all along, I intended to testify. To believe that. Let's follow that. Let's assume those are the facts, that they anticipated he was going to be impeached, but he was going to testify anyway. And his claim now is, when I found out for sure that I could be impeached, I decided not to testify? I guess. I think that is their, what they're now claiming. That's when you understand. That's my understanding. You know, but again, I'm a little dubious about that factually. But to put a fine point on it, I think, frankly, the facts on the performance issue don't essentially matter. We can just look at this de novo on the prejudice prong and see there wasn't prejudice by a country mile, at least in our view. I do, in just a couple more minutes I have here in my opening, and I'll reserve my time for rebuttal. I do just want to highlight a couple of the, in our view, sort of unfortunate policy implications of ruling for the petitioner here. I think, number one, we would impose on district courts an additional burden. In other words, you know, when we have this chance of telling a defendant, yeah, you can testify or you cannot. It's your decision. The district judge, to avoid this very scenario from happening, would then need to say, well, wait a minute. Has your lawyer told you about loose? You know, has your lawyer told you about this precedent and that precedent? And if we start going down that road, it's, let's just say, we put a laundry list on the district court to have to find. And we think this court in Sexton said, we're not going to do that. The advice to testify or not is going to be the trial counsel's job. We're not going to make the district courts do it. But that would be the practical application of ruling for Mr. Robinson here. The other, you know, sort of difficult, I think, policy decision would be, I think, allowing a little bit of sandbagging, frankly, to go on. In other words, a defendant could do one trial strategy, not testify, see how it works. And then if it doesn't work, come back and say, well, my lawyer didn't tell me about this case or that case. So I want to do over. The reason I ask you the question was, I'm looking at Appali's brief. It says, more of a trial counsel confirmed that in preparing for trial, it had been presumed that the prior conviction of conspiracy to commit murder would be introduced, but Mr. Robinson nevertheless intended to testify. And they cite the affidavit of Mr. Zayon. Right, so I guess that's, again, like after the 2255 litigation happened, that's what they're now saying was their presumption, the idea that they sort of presumed it was going to come in, but they were still going to testify. But it's kind of interesting. What happened initially was on Joint Appendix Page 173, the court initially said the murder conviction is not going to come in. And so even though they said the murder conviction is not going to come in, the decision was still made, you know, we're not going to testify. And obviously, then he made that tentative ruling saying, well, in fairness, because of what I've heard, I'm going to let that murder conviction come in. And that, I think, brings up an interesting point in the record. The district judge who heard all the witnesses, you know, used the word, I don't want to be buffaloed. And I don't want to have this jury have what essentially is a false defense theory put forward. That just isn't fair. So I think that impacted the court's ruling. But I think, to your point, Your Honor, I think it almost makes it, frankly, a cleaner case in the sense that we don't have to worry about whether the court was, you know, the 609 issues. I think they just presumed that that stuff was going to come in, and they're now saying they were going to testify anyway. Well, the reason I bring up the point is that I don't understand the two positions. You think it's going to come in, and you plan to testify. Then you find out for sure it is going to come in, and then you say, I'm not going to testify. I mean, I'm having trouble reconciling those two. Well, I am too, Your Honor. But I guess how I would square that circle is, you know, with all due respect to the trial counsel and his affidavit, I actually don't think it's correct that he, in fact, always wanted to testify. In other words, I think, you know, they made a game-time decision. So he's always wanted to testify or always not wanted to testify? Well, the trial counsel's affidavit said it was their strategy always to have him testify. And again, I... When was that affidavit? So it was written during the 2255 litigation. So it was 2015. Sorry, 16. Essentially, it was submitted sometime after the conviction. Is this the same lawyer who represented to the court that he only anticipated having the fiancée testify? Correct. Yeah, the same trial counsel. So I see that time is dwindling down. I guess I'll reserve the rest of my time for rebuttal if there's no other questions at this time. All right. Thank you. Thank you, Your Honor. Good morning, Your Honors. May it please the Court. Judge Wilkinson, Judge Traxler, and Judge Agee, my name is Charles Curlette, and I represent the appellee of the court. Kenneth Robinson in this case. It is an unusual posture to represent an appellee on a 2255 case. And I think, though, that it is appropriate in this circumstance. In ruling on the 2255 motion, Judge Motz made the two requisite findings under Strickland. First, that trial counsel's performance fell below an objective standard of reasonableness. And secondly, that he suffered prejudice as a result. Judge Motz's order concluded with a finding that the trial counsel had been ineffective. That is a legal conclusion that requires the two findings set forth. What page are you on with that? In the appendix, his order that says that. Your Honor, I don't have that page citation committed to memory. But in the judge's order, it is brief. It is one page. There is a paragraph where— This is the second order. This is the second order. The motion will be denied because it's entirely without merit. That's correct. And then Mr. Robinson found his way to an attorney, Mr. Vitek, who then filed a subsequent 2255 petition. He was still within the one-year limitations period. And it was Mr. Vitek who obtained the affidavit from Mr. Zayon upon which Judge Motz relied in changing his prior order under the 2255. And the order that brings us here today is the second order. In the first paragraph of that order, Judge Motz credited Mr. Zayon's representations that the reason that he had advised his client not to testify was because he thought that an appealable issue had arisen in the course of the trial. And he was wrong because he was unaware of the loose case, which essentially says that a defendant would have to testify to be able to raise that appellate issue. And I think this goes to Judge Traxler's earlier question, how do we trace the decision-making process of whether he was going to testify and why he changed his mind? Where do we find in the second order there's a finding of prejudice? Because I'm looking at it, and you've only got one paragraph. Correct, Your Honor. My argument is that in the final line where Judge Motz concludes that trial counsel was ineffective, that ineffectiveness is a legal conclusion, the finding of ineffectiveness. And Judge Motz could only reach that legal conclusion if he had found that the two requirements of Strickland had been met. Clearly, the order could be more explicit. It could have spelled out the reasoning and the application and how the Court came about finding that both prongs of Strickland were met. Well, that requires us to imply that that one sentence encompasses both findings of Strickland, and it's, to say the least, unusual that you would have a one-sentence order that doesn't mention either of the standards and say that you should conclude from that that both standards are met. I agree that it is unusual, Your Honor. There is, as mentioned in our brief, there is certainly precedent where district courts do not craft their orders as artfully or as elaborately as an appellate court may prefer. In this instance, Judge Motz, as the Court is certainly aware, has been a district court judge in the District of Maryland for many, many years. The only standard to apply in this case is the Strickland standard, and the Strickland standard was briefed in the 2255 motions. So I think it is a reasonable inference to that Judge Motz had Strickland in mind and was applying that standard when he made his decision in this case. And it is a decision that is entitled to considerable deference by this Court, as set forth in U.S. v. Oh, but how can you... I still don't understand how you can resolve a case like this without mentioning Strickland. Well, I would have to ask Judge Motz why he chose not to cite the case in his order, but we don't have that. After he issued his decision, the government passed on the opportunity to request an evidentiary hearing so that the Strickland... So that doesn't mean it's not an obscure case. No, and perhaps it's so obvious that Judge Motz did not feel compelled to take greater pains to elaborate on his reasoning in the decision beyond that which he did. Certainly, if the government felt that the order was insufficient, it could have requested an evidentiary hearing so that the factors could be applied in a more exacting way, but instead the government asked for a final order to issue so that it could bring this appeal before this Court. I don't understand what difference all of this makes in terms of... The question we have on the Strickland is whether the lawyer's mistake, whether there was a reasonable probability that the result of trial would be different. How can we say that there's a reasonable probability that the result of this trial would have been different? Given what was found in the car, given what was found in the shorts in the bedroom, given what was found in the ceiling of the basement, given the fact that the murder and drug distributional convictions were going to come in on impeachment, given the fact that the very essence of his testimony had already been presented by Antonia Powell, the question just is, is there a reasonable probability that the result of this trial would have been different? And when you take the impeachment and you take the cumulative nature of the testimony, and above all, you take the real and physical evidence that was found everywhere about him, how could the jury have reached a different conclusion? Well, Your Honor, I'd like to take the cumulative nature of the evidence and whether or not it was overwhelming in turn, but I don't think that this case was nearly as strong as the government suggests and that as the court's questioning might imply. This was a wholly circumstantial case and drugs were found in a home and money was found in a car but... In his house? In his home? Didn't he tell one, if not two police officers where the drugs were in his house? Well, that's the problem, Your Honor, because the only thing that actually connects these drugs to this defendant in this circumstantial case were his statements and that's why it was so important. Which you don't challenge. I mean, there's no challenge that those were coerced or anything else. Well, there was a suppression hearing, and the statements were permitted to come in, but notably here, Mr. Robinson did not sign the Miranda waiver and when the detective Herzog was testifying as to the reason for that, he said, it's a safety issue. When we're exercising a search warrant, we don't uncuff people to sign the Miranda affidavit. And then the question was, what about Ms. Powell? You Mirandized her. Was she handcuffed? No. Well, she didn't sign the Miranda waiver. Why is that? You haven't raised the Miranda issue. Well, but it goes to whether or not it would have made a difference if Mr. Robinson had testified, because certainly what Mr. Robinson would have said was, I didn't make those statements. That's not the standard. You said whether or not it would have made a difference. Well, the standard is, is there a reasonable probability? Right. Not possibility. Probability. And how can there be a reasonable probability that this trial would have come out differently? If the jury had credited the testimony of the defendant, had he testified, had he exercised his right, which his counsel erroneously told him he shouldn't do, and the jury had credited that testimony, that the drugs weren't his, because it would have become a swearing contest between Detective Hurt. You have to ask yourself, they're going to credit that over a murder and drug distributional conviction, and are they going to credit it? When he has pointed the officers in, into the, to the basement where the drugs were found, and where the, his shorts and his car. Well, as to the, as to the shorts, Your Honor. I mean, you know, how gullible do you think the jurors are? Well, I think that jurors in Baltimore City are not particularly gullible, particularly in the face of police officer testimony  when there's no signature on the page indicating a waiver, regarding claiming that a wallet and keys are found in a pair of shorts so that it can link the shorts to the defendant when there is no photograph taken of the wallet and the keys in the shorts as there were for every other piece of evidence in this case. So it's a situation where the key evidence that links this defendant to these drugs and sustains this conviction is wholly dependent. So he was going to testify that the wallet and the keys were not his? There was a line of question, I believe so. There was a line of questioning by Mr. Zayon in the trial that to the detective isn't it true that the keys and the wallet were on the dresser and not in the pockets of the shorts? And he said, no, they were in the pockets of the shorts. Well, why didn't you photograph? Did you photograph the drugs which were in the pockets of the shorts? Why didn't you photograph the wallet and the keys? Well, we just didn't. Ms. Powell testified that she didn't go. The jury heard all that. Well, but it's the statements that they heard that. But what they didn't hear was they didn't have the opportunity to hear Mr. Robinson disavow whether or not he had made the statements to the police that the police said he made. And that's the crucial distinction. So why did that happen? And this goes back to Judge Traxler's question. This trial strategy all along was recognizing that he was going to have to take the stand to testify. It was the only hope of winning. And my understanding based upon the record is that Mr. Zayon anticipated that both of the prior convictions,  within the relevant time frame, would be properly subject of cross of impeachment. I find it hard to believe. I find it hard. The record seems to be me to be very muddled on that score. You know, I'm not sure that he was going to testify that he wasn't going to testify. I don't know. I can see a lot of reasons why the very last thing in the world he would want to do would be to get up would be to get up on that stand. Well, there's no question. There's no question that these prior convictions would be extraordinarily prejudicial. And I think that's why Judge Motz was inclined not to let in the prior murder conviction initially. But nonetheless, the decision had been made. I mean, we're not talking about shoplifting here. We're talking about murder. Right. A murder conviction. Right. Conspiracy to commit murder. He was not the trigger puller, Your Honor, under the facts of that. Conspiracy to commit murder plus a drug distributional offense. And what was already a very unfavorable situation for this gentleman was going to become dire. Well, Your Honor, I think that Judge Motz credited the sworn affidavit of Mark Zayon. And I have no reason and Judge Motz had no reason to suggest that Mr. Zayon would testify untruthfully in a sworn statement to the court. And I would defend Mr. Zayon on that point and say that Judge Motz reasonably credited what he said in the affidavit. I mean, all this is hindsight. Well, except that... Because is there any contemporaneous evidence at the trial that he was really anxious to testify? Not in the trial record, Your Honor. But there's no opportunity for that to be examined. Did the lawyer? No, I mean, is there any record in the trial that he wished to testify? No, Your Honor. You know, suddenly when it becomes convenient on 2255, oh, I really wanted to testify all along. After, of course, the adverse jury verdict is in. Well, Your Honor, as the court is aware, it is the responsibility of defense counsel to have those discussions and provide that advice privately with their client as to whether or not they're going to testify. The district court judges... If we're getting away from the main point, is there a reasonable probability that the result of this trial would have been different? And you're saying that, oh, it was a reasonable probability that the jury would come down differently in the face of all this evidence if this murder conviction had come in. I am saying, Your Honor, that Judge Motz already made that finding. And that finding... He didn't reference Strickland at all. He did not in the four corners of his order. That is correct. But crediting the experience of Judge Motz and the fact that the 2255 motions that were filed in this case focused on the analysis under Strickland. And when you look at the two, the one paragraph, it clearly sets forth the basis for the unreasonable... that counsel's performance fell below an objective standard of reasonableness. And then he jumps to the conclusion. Counsel was ineffective. Strickland is all about how you determine when a counsel is ineffective. You have to... You would think a district court judge that had done these, this many 2255s would have simply gone through the steps they've gone through a hundred times before. Set out the Strickland findings and describe it in detail. That's what we're used to seeing. I know from my own... But look, it's not for me to testify. I know from my experience, though, that Judge Motz can be abbreviated in his orders and we certainly see evidence of that here. But again, you can only reach ineffectiveness if you've applied the two prongs of Strickland. The Supreme Court has urged us to go directly to prejudice in these cases. So don't try to untangle the rest. Just go directly to prejudice. And if we had to be at all practical... Well, I'm not going to repeat this for the fifth time. But to me, to say that the evidence is anything less than overwhelming is to overlook what the evidence actually was. The evidence can only be overwhelming, Your Honor, if you credit the testimony of Detective Herzog. And there were reasons to question his credibility. It's not just the sparse testimony. It's what they found. It is not testimonial evidence, purely. It is real and physical evidence. Drugs, a hot plate, cash, here, there, everywhere, where he said. Somewhat... Well, where he said, again, depends upon crediting the testimony of Detective Herzog. Clearly someone was involved in the drug trade that was in the house. But there was testimony that there were many people with access to the house, including the girlfriend's sister's boyfriend, who happened to get himself killed conveniently before trial. Well, I may also argue inconveniently, depending upon the lack of ability we have in to develop that evidence. But it would further suggest and support the notion if he were killed... You're picking on somebody who's been murdered. Which happens all too frequently in the drug trade in Baltimore, Your Honor, which further corroborates the notion that it was someone else who had, who was living, whose girlfriend was living in the space where the drugs were found and who was there on a regular basis. Mr. Kirtland? Yes, Your Honor. Let me switch gears, get you to switch gears just a second. I still want to go back to what I perceive as inconsistencies in what Mr. Zayon says about what their plans were. First of all, I'd call your attention to the statement in the brief that they anticipated he could be impeached with this prior conviction, but he wanted to testify anyway. But then in trial, when the judge says, OK, basically your assumption is correct. I'm going to let him be impeached with this. Then he says, just so the record's clear, based on Your Honor's ruling with regard to the impeachables, Mr. Robbins is electing not to testify. Right. I mean, that's just patently inconsistent. But it can be explained, and this gets to the heart of the constitutional violation in this case. Step one, Mr. Zayon says to his client, you're going to have to testify. That's going to be our strategy because you're going to have to contradict with this. And we said he wanted to testify. Right. He wants to testify. And then I ask you these questions about that. And I think you're going to get crossed on both convictions. But it's OK. We're going to deal with that. It's going to be prejudicial. It's going to be difficult. But that's what we're going to do. That's the decision. So he gets to the trial. They have the motion on the extent of the 404B evidence that can come in. And Judge Mott says, I'm only going to allow one of them to come in. OK, that's a windfall. Great. Now you're not going to be subject to the same scrutiny we thought you were going to be subject to. And then later in the trial, after hearing the testimony of Antonia Powell, Judge Mott changes his mind. And he says, you know what? Now I'm not going to be buffaloed. So it was a fairness decision because the conviction can properly come in. It's within 10 years. So now he can be crossed on it. This is where Mr. Zayon made his mistake and was unaware of Luce. I think that he said to his client, look, because the judge changed his mind, we now have an issue on appeal that can be successful in reversing the conviction. So the basis for not to testify wasn't because he was afraid of the impeachables, because he was prepared to deal with that. But it was... His telegram was not based on the substance of the ruling, but just the fact the judge changed his mind? I think it would have to be, Your Honor, because he says, now you have an appealable issue. Now he was wrong. And so, all right, well, on that basis... The whole thing is a muddle, but it sounds fishy to me that all of a sudden, you know, when he's not faced with the real world consequences of impeachment, all of a sudden, on 2255, we say, oh, I wanted to testify all along, when he's not faced with the actual consequence during trial of impeachment and having those convictions come in. It's all too easy to say when you're not faced with practical consequences to say, oh, this is what I wanted to do all along. That is just... It just seems unusual to me that one would suddenly see the light because it's a very muddled picture and it's difficult for me to straighten out. But all of a sudden, one sees the light and says, I wanted to testify all along, but I can't see any similar clarity on the point at trial. It just seems to come into focus only on 2255, and that seems fishy. Well, I think that... But it does happen, Your Honor. And here we have the sworn testimony in the form of an affidavit of a respected member of the bar. This is not a defendant's pro se affidavit coming forward and trying to manufacture a convenient excuse and someone who would have less regard for what it means to testify and put forth your credibility and your testimony and taking an oath before the court. And that's what this attorney did. And Judge Motz, I think, credited Mr. Zayon's affidavit and accepted his explanation of the reasons that the strategic decisions were made. And what that revealed was that the strategic decision was based upon an incorrect application of the law. It therefore deprived Mr. Robinson. Sure. I just got one point. Yes, Your Honor. If you... If the lawyer believed that the error that was made was a judge changing his mind, then his knowledge of Luce is irrelevant. Because Luce doesn't go to that subject. I mean, Luce goes to something else. So Luce is irrelevant. His knowledge of Luce is irrelevant if he believes his appellate ground is the judge changed his mind. Well, I think that if... I think that that's the effect of the decision. But I don't think that what Mr. Zayon represented was that is what informed the decision. I think what informed the decision was he thought that he suddenly had an appellate issue. And this is what he represented in his affidavit, which Judge Motz credited. He suddenly thought, now we have an appellate issue. Don't testify. And that's now our better course. Was there any live testimony before Judge Motz on 2255? No, Your Honor. Is there a difference between crediting an affidavit and crediting an actual testimony? Well, I think that the Poindexter standard sets forth that when a judge rules on a 2255 motion without an evidentiary hearing, then the findings are to be construed in the light most favorable to the movement. And what the government is suggesting here is de novo review, where we second guess all of the findings of the district court. It was Judge Motz who had the opportunity to preside over this trial and make the determination about whether or not Mr. Robinson's deprivation of his right to testify on his own behalf so prejudiced his case. Of course, he didn't make that finding. And, you know, we keep coming back to the fact. Although, you know, the idea of a remand to get somebody to make a finding isn't particularly appealing to me. Which is why an affirmance would be the path of least resistance here, Your Honor. Oh, yes. I thought that might be.  But I want to thank you very much. Thank you, Your Honor. And then we'll let Mr. Medinger come up and give us some time for rebuttal. Thank you, Your Honor. I'll be brief and just hopefully respond to a couple of questions that you asked of my colleague and his his responses. First, one of the things my colleague, Mr. Mr. Curlit, indicated was his argument is that Judge Motz, in fact, found prejudice. And those are some questions that he had with Judge Agee. If you look at Joint Appendix, page 432, that is where the second order is. And in our view, that there just aren't any findings there. He did not make those findings. You have to, you can't implicit your way into prejudice findings based on what we have here in this record. Let me ask you a question about how this happened. I'm just curious. I mean, he enters an order, looks like on September 14th, denying the 2255. Then on October 23rd, this supplemental motions file. I mean, I don't understand what's going on. Well, to be to be quite candid, you're actually don't know either. I don't know how it came to be that he all of a sudden reopened his order prior to Mr. Vitek submitting the new supplemental. I don't know how that happened. Given any notice, government given any notice that this change was contemplated or there's no pleadings file. So I did not, Your Honor, the first notice I got of it was when the ECF notice popped up saying the order that I issued a week and a half ago is now rescinded. And then we saw the supplemental come in. So it took us by surprise to be quite honest. And again, considering what the first order said, that his 2255 is wholly without merit. We submitted a supplemental brief and to be quite candid, fully expected the court to say again, this is still wholly without merit. But we got the opposite ruling. And so that's essentially why we're here. But unfortunately, Your Honor, I can't elucidate why it made that 180 degree switch. I just don't know. But another thing that my colleague mentioned, asked this court to apply some sort of deference to the district court. I'll just point out that we're here on de novo review under the Dice case. Additionally, there were some comments made about this being a wholly circumstantial case. I do agree with some of the things you said, Judge Wilkinson, about. We just disagree. The case actually didn't just rise and fall on Herzog. In addition, there was testimony from Officer Cooper. Cooper also heard the statement, oh, everything you need is in the basement. So that's in the record. So we actually have two law enforcement witnesses confirming these, in our view, damning statements. And to get to your point, Your Honor, Judge Wilkinson, the idea that we do have to find a reasonable probability that the outcome would have been different. There's no question that the drugs were found in his car. Is that correct? Well, there was actually no drugs found in the car. In the car? The cash? In the car was the cash. It was $3,600 in a Crown Royal bag. Well, OK. That's a nifty amount of cash, $3,600. It is, Your Honor. Were the $3,600 found in his car? That's the car that he drove. There was testimony that Detective Herzog saw Mr. Robinson operating that vehicle. OK. To be clear, I think it might have been registered to somebody else. But the testimony was. He was driving it. Correct. All right. Now, the shorts were his in the bedroom? That's our contention, Your Honor. We believe that's correct. This was a bedroom that he shared with his fiancee, Ms. Powell, the testimony of. I don't think they really contested that the car was. Did they contest that the car belonged to somebody else or that the shorts belonged to somebody else? So they didn't contest the car, Your Honor. With regard to the shorts, Ms. Powell did indicate that she believed those shorts belonged to D'Angelo. Oh, yeah. Which is again, the dead guy. And Your Honor, again, the testimony, which is interesting here, that D'Angelo and the sister lived in the basement. So how those shorts could find their way up to the bedroom is, again, I think a bridge too far and something that the jury was going to reject. There's just so much about this that just doesn't add up. And, you know, trying to shift all of this to D'Angelo, I mean, it's just, it's so convenient. The hindsight affidavit that, oh, I wanted to testify all along, that's so convenient. I mean, there's just stuff here that doesn't add up. That's our assessment, Your Honor. And that's why, you know, we respectfully ask this court to reverse and reinstate the conviction. Thank you, Your Honors. Thank you. Mr. Curlett, I'd like to extend the court's appreciation to you for what I thought was a very fine argument. And we appreciate the good service that you have provided your client. Thank you, Your Honor. We'd like to come down in brief counsel and then we'll take a brief recess.
judges: J. Harvie Wilkinson III, William B. Traxler Jr., G. Steven Agee